NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230146-U

Order filed December 5, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-23-0146 |
| v. | ) ) | Circuit No. 14-CF-274 |
| ERICK M. MAYA, | ) ) | Honorable Daniel D. Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.[1]
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1       *Held*: Defense counsel was not ineffective for failing to remove a Will County correctional officer from the jury where evidence adduced at *Krankel* hearing failed to establish an implied bias.

_____

[1] Justice Hettel participated in this appeal and authored the disposition, but his term has since expired. Our supreme court has held that the departure of an authoring judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Kinne v. Duncan*, 383 Ill. 110, 113-14 (1943).

¶ 2 Following his convictions for first degree murder, attempted first degree murder, and unlawful use of a weapon by a felon (UUWF), defendant, Erick M. Maya, filed a *pro se* motion for a new trial asserting that his counsel was ineffective for, among other things, failing to remove a Will County correctional officer from the jury pool. The circuit court denied his motion. After sentencing, defendant filed a second *pro se* motion, reasserting his claims that counsel was ineffective, which the court again denied.

¶ 3 On direct appeal, this court reversed the circuit court's ruling and remanded with instruction to conduct a *Krankel* inquiry into defendant's ineffective assistance claims. *People v. Maya*, 2017 IL App (3d) 150079 (*Maya I*). The circuit court found defendant failed to show possible neglect of the case and declined to appoint new counsel. Defendant appealed again, and this court concluded that the circuit court's preliminary inquiry determination under *Krankel* was manifestly erroneous, remanding for appointment of new counsel and further proceedings as to the potentially biased juror. *People v. Maya*, 2019 IL App (3d) 180275 (*Maya II*).

¶ 4 On remand from the second appeal, the circuit court conducted a full evidentiary hearing and determined that trial counsel was not ineffective in failing to challenge the correctional officer as a juror. Defendant appeals, claiming the circuit court erred in determining that counsel's actions were reasonable where counsel failed to remove a "presumptively" biased juror. We affirm.

¶ 5 I. BACKGROUND

¶ 6 In March 2014, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2014)), attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)(1)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and UUWF (*id.* § 24-1.1(a)). The indictment alleged in part that defendant shot his sixteen-year-old ex-girlfriend, Briana Valle, causing her death, and then shot her mother, Alicia Guerrero, with the intent to kill her.

2

¶ 7    The case proceeded to trial on September 9, 2014. At the beginning of jury selection, the judge introduced the individuals participating in the trial, including the prosecutors, defendant, defense attorneys George Lenard and Samantha LaRowe. He then read the names of 72 potential witnesses. After reading the list of witnesses, the judge stated:

> "Those are the list of potential witnesses[.] That doesn't mean they are all going to testify[.] Those are the potential ones. Quite a list[.]
>
> In any case, Ms. Geis, based on the introductions that were just made to you by both the prosecution, defense, and defendant, and the list of potential witnesses I have just read to you, do you know of any of those people whose names I have just read or people you were just introduced to?"

The first three venire members answered, "No." The fourth member, identified as "Juror Brophy," answered, "Yes." She stated that she "[p]otentially" knew a detective on the witness list. The court followed up by asking, "Do you know him socially or know of his name?" and Juror Brophy responded, "I was on the school board and worked with him on the school board." The court indicated further questioning might be necessary and then continued. The remaining 35 venire members responded, "No," including the 19th venire member, Kevin McGrath.

¶ 8    The court asked the prospective jurors to provide their names, addresses, and occupations. McGrath stated, "I am a deputy correctional officer with the Will County Sheriff's Department." The court also inquired whether anyone had friends or relatives who worked in law enforcement or the prosecutor's office. McGrath indicated that his son-in-law was an assistant Will County state's attorney. Later, during questioning outside the presence of the other jurors, one of the prosecutors explained that McGrath's son-in-law was a "drug assistant" who had no connection to the case. McGrath stated that he would remain fair and impartial despite his son-in-law's position.

3

¶ 9         As *voir dire* concluded, the court reminded the venire members that "every defendant is entitled to a fair and impartial jury" and that "both the State and defendant are entitled to a fair and impartial jury trial." McGrath affirmed that he would be a fair, impartial, and objective juror.

¶ 10        The court tendered the jury to the parties, who were each allotted seven peremptory challenges. The defense used three peremptory challenges before selecting a jury of twelve. The court then tendered a panel of four alternative jurors, which included McGrath. Defendant's attorneys used two more challenges but did not excuse McGrath. During trial, a juror became ill, and McGrath was seated on the jury.

¶ 11        A full narration of the testimony at trial can be found in *Maya I*. We include only relevant portions here. Guerro testified that her daughter, Briana, ran away from home in 2012, at the age of 14. Guerro located her through Guerro's Facebook account and called the police, who located Briana living with defendant and his friends in Cicero. When Briana returned home, she remained in contact with defendant. In September 2013, Guerro noticed Briana was wearing an engagement ring. The next month, she moved the family from Cicero to Romeoville to "get away" from defendant.

¶ 12        Defendant became angry with Guerro and blamed her for ending his relationship with Briana. In addition to threatening Guerro, he sent numerous threatening text messages to Briana through a mutual friend, in which he exhibited jealousy toward Briana and repeated threatened to rob, rape, murder and kidnap her and her family.

¶ 13        Jasmeet Atwal testified that defendant borrowed a gun from him on February 1 or 2, 2014. On February 13, Stephen Sanders, a taxi driver, picked up defendant in Cicero and dropped him off three or four houses down from Briana's house in Romeoville at 6:45 a.m. Around the same time, Guerro testified that she and Briana walked out of the house and got into Guerro's car to

4

drop Briana off at school. Guerro heard a pop and turned to look at Briana, who had been shot in the head. Guerro then noticed a man holding a revolver standing at the passenger side window. He pointed the gun at her and shot her in the shoulder.

¶ 14 Romeoville police found defendant hiding underneath a porch near the scene. Gunshot residue was found on his right sleeve. Officers found a handgun in the snow near the area of the shooting a few days later. Atwal testified that it was the same gun he had given defendant. At the conclusion of defendant's trial, the jury found him guilty on all counts.

¶ 15 Defendant filed a *pro se* motion for a new trial. Among other claims, he alleged that one of his attorneys, Lenard, had been ineffective in failing to remove "a correctional officer from the facility housing him" from the jury pool. Defendant claimed that Lenard "knowingly refused to use a peremptory strike" to remove the jury thereby depriving him of a fair trial by an impartial jury." Defense counsel subsequently withdrew the motion, with defendant's consent, and filed a revised motion, which the court denied.

¶ 16 The court sentenced defendant to consecutive terms of imprisonment of 72 years for first degree murder, 39 years for attempted first degree murder, and 11 years for unlawful use of a weapon by a felon. Shortly afterward, defendant filed a *pro se* motion for sentence reduction. In his motion, defendant claimed that his sentence should be reduced and that counsel was ineffective. On the issue of ineffectiveness, defendant alleged 33 separate grounds, among which was a claim that counsel had been ineffective for refusing to strike a juror who "is a correctional officer in the facility in which the Defendant is incarcerated in" and with whom defendant had engaged in "several confrontations." Defendant also alleged that he was "denied a fair and impartial jury" when counsel allowed the correctional officer to serve on the jury. At the hearing on the motion, the court did not

allow the defendant to argue his ineffectiveness claims, only allowing him to address the issues related to sentencing. The court denied defendant's motion.

¶ 17     On direct appeal, this court agreed with defendant's argument (and the State's confession of error) that the circuit court failed to properly address defendant's posttrial claims of ineffective assistance of counsel. *Maya I*, 2017 IL App (3d) 150079, ¶¶ 96, 104-05. We remanded the matter with instructions to conduct a preliminary *Krankel* inquiry. *Id.* ¶ 105.

¶ 18     At the preliminary hearing on remand, defendant maintained that he was denied a fair trial because defense counsel allowed McGrath, a correctional officer with whom he had conflicts, to be empaneled on his jury. Defendant asserted that he and McGrath had several "altercations," McGrath told other inmates that defendant's case involved a minor "in hopes to have them attack [defendant]," and McGrath visited defendant's cell and "verbally insulted [him]." Defendant claimed that when he informed Lenard he did not want McGrath on his jury, Lenard simply stated, "Well, he said he was going to be fair." Defendant also claimed that counsel was ineffective for failing to use a preemptory challenge to remove McGrath. The court concluded that defendant had not shown possible neglect of the case and declined to appoint new counsel.

¶ 19     On appeal the second time, this court observed that "[i]f the defendant's factual allegations are true," the assertions that McGrath had altercations with defendant in jail and induced other inmates to harass defendant "demonstrate *actual* malice and bias." (Emphasis in original.) *Maya II*, 2019 IL App (3d) 180275, ¶ 35. We also noted that "[t]rial before a biased jury is structural error and requires automatic reversal." *Id.* (citing *People v. Thompson*, 238 Ill. 2d 598, 610 (2010)). We then  reversed and remanded for the appointment of counsel and further proceedings on defendant's claim of ineffectiveness, stating:

"We make no finding as to the credibility of the defendant's factual allegations. However, given the serious nature of the allegations, the absence of any explanation from defense counsel as to the facts and circumstances surround the allegations, and the fact that the record shows that McGrath was a Will County correctional officer, we hold that the circuit court's determination that the defendant failed to demonstrate possible neglect of the case was manifestly erroneous." *Id.* ¶ 36.

¶ 20    The circuit court appointed counsel and held an evidentiary hearing on defendant's ineffective assistance claim in March 2023. The defense called McGrath, who was 71 years old at the time. He testified that he had been a correctional officer at the Will County Adult Detention Facility (detention facility) from 2004 until he retired in May 2015. He was trained to "monitor the pods with the inmates," and he also served as a field training officer, training new recruits on the job. McGrath testified that he did not know defendant when he was working at the detention facility, but he "knew of him," which is to say he "knew him by name." The judge never asked him if he knew defendant during jury selection, and McGrath did not disclose that he had been assigned to defendant's pod. The only matter he was questioned about was his son-in-law.

¶ 21    McGrath testified that he "occasionally" worked in the pod defendant resided in. McGrath was not assigned to the same pod all the time because correctional officers worked a rotating schedule. He could not recall ever talking to defendant other than "probably just to acknowledge him." He had "very little" contact with defendant at the detention facility because he worked the night shift from 11 p.m. to 7 a.m. and most of the inmates were sleeping. McGrath never had an altercation with defendant; he did not verbally harass or assault defendant; he did not provide details regarding defendant's criminal case to other inmates; and he did not encourage other inmates to threaten defendant. McGrath testified that nothing about his employment as a

7

correctional officer prevented him from being a fair and impartial juror in defendant's case. He was not biased against defendant when he sat as a juror during the trial.

¶ 22    McGrath acknowledged that, as a correctional officer, he occasionally had access to information regarding an inmate's charges, but he stated: "I wouldn't be looking for it." In defendant's case, he "believe[d]" he knew what the charges were, but he could not remember them now.

¶ 23    Defendant testified that he was an inmate in the detention facility for seven to eight months following his arrest. He resided in several different pods. He first came into contact with McGrath in "I Pod" in June 2014. During their first encounter, McGrath told defendant to "shut the fuck up, you little bitch or do you want to go back to seg[?]" When defendant told him to "go ahead" and send him back, McGrath replied, "[F]uck you."

¶ 24    Defendant came into contact with McGrath again in August 2014. He testified that no one else was present when McGrath stopped in front of his cell and said:

"[Y]ou little bitch, you fucked up, you shot and killed that little girl and her mom and now look what's going to happen. You're going to spend the next 30 years in prison. You're going to get out, get deported and when you go – when you get deported they're going to kill you. Them cartel people don't like child molesters or rapists, so you're going to get what's coming to you."

¶ 25    Defendant recalled another incident in August 2014 when McGrath knocked on his window and told him he "fucked up" by shooting Briana. McGrath then taunted defendant, saying he could not do "shit" because McGrath was "not a little girl" and defendant did not have a gun anymore. He testified that there were a few more incidents where McGrath walked by his cell and

8

called him a "child molester" and a "pedophile," but he could not remember exactly when those incidents happened.

¶ 26 Defendant testified that when he first saw McGrath during jury selection, he informed Lenard that McGrath was a correctional officer at the detention facility and that he did not want him on the jury. Lenard dismissed his concerns. After McGrath was recalled for further questioning, defendant told Lenard that McGrath had been coming to his cell and "talking shit" to him and telling other inmates about his case. Defendant stated that he did not want McGrath on the jury, and Lenard replied, "[W]ell, he said he was going to be fair." Defendant asserted that he told Lenard that he knew McGrath and had concerns multiple times during jury selection. He acknowledged that he did not express his concerns to defense attorney LaRowe or the court. He testified that LaRowe probably did not hear him talking to Lenard about McGrath because he whispered the information to Lenard.

¶ 27 According to Lenard, McGrath did not exhibit any concerning signs during *voir dire*. Nothing about McGrath's body language led Lenard to believe he could not be fair and impartial. McGrath was attentive and thoughtful in answering questions and his profession was not concerning. During *voir dire* proceedings, defendant did not say anything about McGrath. Defendant did not inform Lenard that he had conflicts with McGrath at the detention facility, that McGrath mistreated him, or that McGrath told other inmates about defendant's case to induce violence against him. Lenard testified that if defendant had told him that McGrath was treating him unfairly at the jail, Lenard would have asked McGrath about it, and if he had any concerns about McGrath's fairness or impartiality, he would have removed McGrath from the jury pool.

¶ 28 Lenard testified that after *voir dire*, the court took a short recess to allow the parties to discuss jury selection. Lenard and LaRowe discussed which jurors to strike in defendant's

9

presence. Defendant did not mention his concerns about McGrath, and when the defense used their preemptory strikes, defendant again said nothing about McGrath. Lenard would have used a preemptory strike to remove McGrath, if he had known that McGrath worked in defendant's pod.

¶ 29　　LaRowe testified similarly that there was nothing about McGrath's occupation or demeanor that caused her concern during jury selection. Defendant did not tell them to strike McGrath, and she was unaware that defendant knew McGrath from the detention facility.

¶ 30　　The circuit court found McGrath's testimony credible. The court found that McGrath was not intentionally untruthful when he answered that he did not know defendant during *voir dire*, noting that "in his mind he was answering truthfully." By contrast, the court found defendant's testimony lacked credibility, finding it "completely incredible" that defendant asked Lenard to remove McGrath multiple times where defendant, by his own admission, never told LaRowe that he knew McGrath and never raised the issue with the court. It also rejected defendant's claims that McGrath made harassing statements towards him, explaining: "[T]he language that [defendant] attributes to Juror McGrath lacks credibility with me because in judging the testimony, the way Juror McGrath spoke, I don't find the words of [defendant] attributed to him as something he would say."

¶ 31　　Finally, the court held that even if McGrath had not been seated on the jury, the verdict would not have changed. The court concluded counsel was not ineffective and denied defendant's motion for a new trial based on ineffective assistance of counsel and juror bias.

¶ 32　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 33　　On appeal, defendant argues that defense counsel was ineffective in failing to properly question and remove an impliedly biased juror from the jury pool. He further maintains that counsel's error was structural, requiring automatic reversal.

10

¶ 34                                    A. Forfeiture

¶ 35        At the outset, we address the State's claim of forfeiture. The State argues that defendant

forfeited his ineffective assistance claim based on implied bias because the question of whether

juror McGrath was impliedly biased was not raised in the circuit court. The State notes that there

are two types of juror bias—actual and implied—and, since defendant did not expressly raise the

issue of implied bias below, the issue is forfeited. We disagree.

¶ 36        Our supreme court has recently distinguished that actual and implied bias are two types of

the broader concept of juror bias. *Ittersagen v. Advocate Heath and Hospitals Corp.*, 2021 IL

126507, ¶ 40 (noting that actual and implied bias fall within a larger category that comprises all

cases of alleged juror partiality). Here, defendant argued in his initial posttrial motion that trial

counsel was ineffective for failing to remove a correctional officer from the jury pool and that the

correctional officer's empanelment denied him a fair trial by an impartial jury. Moreover, on

remand from *Maya II*, defense counsel generally argued during the evidentiary hearing that

defendant's trial attorneys were ineffective for failing to strike McGrath because he was biased

against defendant based on his employment as a correctional officer in the detention facility.

Although the allegations did not specifically mention implied bias, such bias is included within

the larger notion of juror bias. See *id.* Thus, the arguments were sufficient to preserve the question

of whether trial counsel was ineffective for failing to strike a juror who was impliedly or

presumptively biased against defendant. The issue of counsel's ineffectiveness based on implied

bias has not been forfeited.

¶ 37                          B. Ineffective Assistance of Counsel

¶ 38        Having found no impediment to our review, we turn to the merits of defendant's claim that

counsel was ineffective in failing to remove McGrath.

11

¶ 39    Ineffective assistance of counsel claims are reviewed under the well-known standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To prove ineffectiveness, the defendant must show both that (1) counsel's conduct fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88.

¶ 40    Under the first prong, defendant must overcome the strong presumption that the challenged inaction might have been the product of sound trial strategy. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). "*Voir dire* is conducted to assure the selection of an impartial jury, free from bias or prejudice, and grant counsel an intelligent basis on which to exercise peremptory challenges." *People v. Dixon*, 382 Ill. App. 3d 233, 243 (2008). Thus, defense counsel's decisions during *voir dire*, including whether to exercise a peremptory challenge, involve matters of trial strategy that are generally immune from ineffective assistance of counsel claims. See *People v. Manning*, 241 Ill. 2d 319, 333 (2011) (noting that "counsel's strategic choices are virtually unchallengeable"); see also *People v. Metcalfe*, 202 Ill. 2d 544, 562 (2002) ("*voir dire* involves matters of trial strategy that generally are not subject to scrutiny under *Strickland*"). In evaluating deficient performance, courts must consider counsel's actions from his or her perspective at the time the contested action was taken. *People v. Bailey*, 232 Ill. 2d 285, 289 (2009). Attorneys consider numerous factors in challenging and accepting potential jurors, and "reviewing courts should hesitate to second-guessing counsel's strategic decisions, even where those decisions seem questionable." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 71 (citing *Manning*, 241 Ill. 2d at 335).

¶ 41    The second prong of *Strickland* requires the defendant to show that absent counsel's deficient performance, there is a reasonable probability the proceedings would have turned out

differently. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Id.* at 220. Failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Gayden*, 2020 IL 123505, ¶ 27.

¶ 42                                  1. *Deficient Performance*

¶ 43          Defendant's argument focuses on the first prong of *Strickland*, claiming that counsel was deficient in failing to question McGrath regarding his duties as a correctional officer and then failing to strike him from the jury pool. He claims that counsel's decision not to remove McGrath was unreasonable because his position as a correctional officer and his interaction with defendant created an implied bias that cannot be cured.

¶ 44          Every criminal defendant is entitled to a fair trial by an impartial jury. U.S. Const., amend. VI; Ill. Const. 1970, art. 1, § 8; see also *People v. Bush*, 2023 IL 128747, ¶ 73 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). "[A] juror is not impartial if his experiences, opinions, predispositions, biases, prejudices, interests, or relationships 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (Internal quotation marks omitted.) *United States v. Sampson*, 820 F. Supp. 2d 151, 162 (D. Mass. 2011) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

¶ 45          Juror bias may be actual or implied. *Ittersagen*, 2021 IL 126507, ¶ 40. Actual bias is "bias in fact" (*Bush*, 2023 IL 128747, ¶ 73), which exists when a juror's actual state of mind is such that he or she cannot be impartial (*People v. Cole*, 54 Ill. 2d 401, 413 (1973)). Implied bias applies "in those extreme situations where the relationship between a prospective juror and some aspect of the

13

litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." (Internal quotation marks omitted.) *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007). Implied bias is presumed and is attributable as a matter of law to the prospective juror, regardless of actual impartiality. *Ittersagen*, 2021 IL 126507, ¶ 40.

¶ 46 Implied bias exists only in "extraordinary situations." *Id.* ¶ 47. Our supreme court has recognized that "there are certain relationships which may exist between a juror and a party to the litigation which are so direct that a juror possessing the same will be presumed to be biased and therefore disqualified." *Cole*, 54 Ill. 2d at 413 (noting that, at common law, "a juror was presumed to be biased and therefore disqualified if he was related to a party to the litigation through blood or sanguinity or through certain indirect personal relationships"). Whether a juror's relationship to a party is " 'extraordinary' " depends on "the 'degree of closeness' of the relationship." *Bush*, 2023 IL 128747, ¶ 74 (quoting *Ittersagen*, 2021 IL 126507, ¶ 68).

¶ 47 Recently, in *Bush*, our supreme court cited close relatives and familial relationships as examples of "extraordinary situations" to which an implied or presumed bias would apply. *Id.* ¶ 75. In adopting the close-relative standard, the court held that "the touchstone of the inquiry *** is whether the average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case." (Internal quotation marks omitted.) *Id.* With that limited situation in mind, the court concluded:

> "We are reluctant to create a bright line category of individuals to which an implied bias will be imputed because a finding of implied bias cannot be rebutted by even the strongest proof of a juror's impartiality. The better approach, when a defendant raises a colorable claim of juror bias, is to investigate the closeness of the relationship to determine whether a prospective juror suffers from an implied bias. ." *Id.* ¶ 76.

14

¶ 48    In reviewing claims of juror bias, the standard of review is a two-part test. "Regardless of whether the objecting party alleges actual bias or implied bias, the juror's relationship to the parties is a question of fact to be answered from the evidence, and the court's finding regarding the relationship should not be reversed unless it is against the manifest weight of the evidence." *Ittersagen*, 2021 IL 126507, ¶ 51. Under the manifest weight standard, we give great deference to the circuit court's credibility determinations "because the fact finder is in the best position to evaluate the conduct and demeanor of the witnesses." *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 548 (2007). However, whether the juror's relationship to a party supports a presumption of bias is a question of law we review *de novo*. *Ittersagen*, 2021 IL 126507, ¶ 47. In other words, we defer to the trial court's assessment of juror credibility and the nature of the relationship and then apply those facts to the law to determine if the juror suffers from an implied bias. *Bush*, 2023 IL 128747, ¶ 72.

¶ 49    In this case, there is a dearth of evidence suggesting that McGrath had a close relationship to defendant that rises to the level of an "extraordinary situation." McGrath testified at the posttrial evidentiary hearing that he monitored various pods, including defendant's, based on a rotating schedule. He worked the night shift, from 11 p.m. to 7 a.m., and had "very little" contact with any of the inmates because they were generally sleeping. He could not recall ever talking to defendant, other than perhaps an acknowledgment in passing. Further, although McGrath "believed" he had access to inmate records, he gave no indication that he accessed defendant's information while working in the jail. Most significant, McGrath stated that he did not have conversations with defendant, threaten or harass defendant, or encourage other inmates to attack defendant. In sum, he gave no indication that he had any relationship—close, personal, or otherwise—with defendant.

¶ 50    Defendant had the burden to show bias at the posttrial hearing but did not refute McGrath's testimony with evidence of a relationship other than his own testimony, which the court found lacked credibility. See *Ittersagen*, 2021 IL 126507, ¶ 58 (plaintiff had the burden of showing bias but did not refute juror's testimony with evidence of a close relationship between the potentially biased juror and defendant hospital). The circuit court is in the best position to make credibility determinations, and nothing in the record leads us to conclude that the court's finding was against the manifest weight of the evidence. See *Samour*, 224 Ill. 2d at 548.

¶ 51    Furthermore, we are unpersuaded that McGrath's admission that he "knew of" defendant creates the close, emotional relationship necessary for us to presume juror bias. In both *Bush* and *Ittersagen* the relationships were more closely intertwined and yet our supreme court determined that an implied bias did not exist. See *Bush*, 2023 IL 128747, ¶¶ 77-78 (presumption of implied juror bias did not arise where juror disclosed that she was related by marriage to one of the victims/witnesses); *Ittersagen*, 2021 IL 126507, ¶¶ 54-58 (juror's fiduciary duty to endowment affiliated with defendant hospital did not create an implied bias). Because defendant failed to establish a close relationship, defense counsel in this case cannot be considered ineffective. See *Jones*, 2012 IL App (2d) 110346, ¶ 71 (trial counsel's choices during jury selection are generally a matter of trial strategy and immune from claims of ineffective assistance of counsel).

¶ 52    Defendant claims that McGrath was impliedly biased because he was defendant's "master," citing *Ittersagen* wherein the court noted that a jury " 'is not a competent juror in a case if he is a master, servant, steward, counselor or attorney of either party.' " (Internal quotation marks omitted.) *Ittersagen*, 2021 IL 126507, ¶ 41 (quoting *City of Naperville v. Wehrle*, 340 Ill. 579, 582 (1930)). But nothing in the record supports such a significant classification of their relationship. McGrath testified that he was assigned to different pods based on scheduling, and that, as a result,

16

he worked in the same pod as defendant "occasionally." However, he expressly testified that he did not have direct conservations or interactions with defendant. Admittedly, ordering defendant to make his bunk, placing him in handcuffs, or reprimanding him for misconduct would suggest an assertion of dominance and place McGrath's competency as a juror in question. See Merriam-Webster's Collegiate Dictionary 764 (11th ed. 2020) (defining "Master" as "one having authority over another"). But none of those facts exist here. We will not presume that McGrath was defendant's master merely because he was assigned to the same area of the detention facility where defendant resided.

¶ 53    Defendant urges us to take "McGrath's false and misleading statements" during *voir dire* into consideration in determining whether he was impliedly or presumptively biased against defendant. First, we disagree with defendant's assessment of McGrath's testimony as false or misleading. Although McGrath responded negatively to the court's *voir dire* question regarding whether he knew any person that had been introduced, at the evidentiary hearing on remand he explained that he "knew of him" while working at the detention facility but had not interacted with him.

¶ 54    Second, by isolating McGrath's answer to that one question, defendant inflates its significance and takes it out of context. Contrary to defendant's approach, the entire *voir dire* must be considered, meaning that it is improper to focus on one answer or a few answers that skew the analysis of whether defense counsel was deficient. See *Manning*, 241 Ill. 2d at 334. A full reading of the *voir dire* transcript reveals that after hearing the names of 72 potential witnesses, McGrath and 38 other venire members answered "No" to the court's question regarding their knowledge of anyone introduced to them. Shortly before McGrath answered "No," the court asked another potential juror to clarify whether she "knew" or "knew of" a person named on the witness list. She

17

clarified that she knew the witness personally, and the court noted that further inquiry was needed. Thus, it stands to reason that when asked to respond moments later, McGrath answered, "No," because he believed, based on the court's previous discussion with another venire member, knowing defendant's name was not equivalent to knowing him personally. Later, when asked whether he knew anyone in law enforcement, he promptly informed the court that his son-in-law worked as a prosecutor in the State's Attorney's office. Overall, McGrath stated that he did not know any potential witness, would consider the evidence presented by both parties objectively, and believed that defendant was entitled to a fair and impartial trial. Because the totality of McGrath's responses showed that he could be fair and impartial, it was a matter of trial strategy for dense counsel to accept him as juror.

¶ 55      Moreover, the circuit court assessed the falsity of McGrath's answer and concluded that he did not intentionally answer the question untruthfully. The court found his testimony that he did not know defendant personally to be credible, and there is no plausible reason for us to overrule that determination. See *In re An. W.*, 2014 IL App (3d) 130526, ¶ 55 (manifest-weight-of-the-evidence standard requires that we give deference to trial court's factual finding, as it is the best position to weigh the credibility of the witnesses).

¶ 56      Focusing, instead, on the relationship between the juror and the defendant, as we must in an implied-bias analysis, we return to the standard discussed in *Ittersagen* and emphasized in *Bush*—whether a prospective juror suffers from an implied bias depends on the closeness of the relationship. The question in this case is whether an average person in McGrath's position would feel substantial emotional involvement in the case despite any assurances to the contrary. Nothing in the record demonstrates that McGrath and defendant had an emotional bond or close connection.

18

¶ 57   Notably, our supreme court has found counsel's failure to remove a juror to be sound trial strategy even though the juror had considerably stronger relationships and emotional connections with the parties. In *Bush*, the juror was the step-grandmother of one of the victims who was also a witness at trial. *Bush*, 2023 IL 128747, ¶ 21. However, the record established that she did not consider herself a grandmother and had not met the victim. *Id*. The court concluded that counsel's decision not to remove the juror was objectively reasonable. *Id*. ¶¶ 79-80 (noting that counsel's performance did not fall below "an objective standard of reasonableness" and "[d]efendant has not established that trial counsel performed deficiently"). And in *Metcalfe*, the Illinois Supreme Court concluded that defense counsel's decision not to use a preemptory challenge to remove a juror was reasonable even though she had been a victim of the same offense as the one charged in defendant's case and had an unfavorable experience at trial. *Metcalfe*, 202 Ill. 2d 561-62.

¶ 58   Here, the substance of McGrath's relationship existed in title only. He was a correctional officer occasionally assigned to defendant's pod. Questioning during the evidentiary hearing did not establish that McGrath's position created substantial emotional ties to defendant or an implied prejudice. In sum, the inquiry failed to satisfy the close-relationship standard.

¶ 59                                              2. *Prejudice*

¶ 60   Finally, even if we assume that defense counsel's actions were not objectively reasonable, defendant's claim of ineffective assistance of counsel may be disposed of on the ground that he suffered no prejudice from the alleged error. See *People v. Johnson*, 128 Ill. 2d 253, 271(1989) (ineffective assistance of counsel claims can be disposed of on ground that defendant suffered no prejudice without deciding the first prong of *Strickland*). To show prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Here, the circuit court

19

found, and we agree, that the evidence was more than sufficient to prove defendant guilty beyond a reasonable doubt. Moreover, the trial record does not demonstrate that McGrath was actually biased against defendant. Consequently, we cannot say that the result of the proceeding would have been different if McGrath had not served as a juror at defendant's trial.

¶ 61                                                    C. Structural Error

¶ 62        Defendant attempts to avoid the prejudice prong of *Strickland* by arguing that he stood trial before a biased jury, which is "automatically reversible structural error."

¶ 63        Our supreme court has equated "structural error" with the second prong of the plain error rule. *Thompson*, 238 Ill. 2d at 613-14 (citing *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). The second prong of plain error, however, is narrow and applies "only in those exceptional circumstances where, despite the absence of objection, application of the rule is necessary to preserve the integrity and reputation of the judicial process." (Internal quotation marks omitted.) *People v. Jackson*, 2022 IL 127256, ¶ 28. Structural errors include "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *Id.* ¶ 29. Failure to administer the state's constitutional oath to swear in a jury also constitutes structural error. *People v. Moon*, 2022 IL 125959, ¶ 64. If a defendant succeeds in establishing second-prong plain error, prejudice is presumed. *People v. Herron*, 215 Ill. 2d 167, 180 (2005).

¶ 64        We have difficulty adopting defendant's "structural error" argument in this case for two reasons. First, defendant's argument conflates the standard of review applied to claims of ineffective assistance under *Strickland* with structural error under the second prong of the plain error doctrine. This is not a structural error case. Defendant has not forfeited the issue; therefore, the plain error rule—particularly second-prong plain error—does not apply.

20

¶ 65     Second, the underlying legal theory, and the essence of defendant's claim, is that prejudice should be presumed in the context of ineffective assistance. That argument has been rejected by the Illinois Supreme Court not once, but twice.

¶ 66     In *Metcalfe*, the supreme court addressed the defendant's argument that his trial counsel was ineffective for failing to challenge a juror and that prejudice should be presumed because a biased juror served on his jury. *Metcalfe*, 202 Ill. 2d at 559-61. The defendant did not claim that his counsel completely failed to oppose the prosecution during *voir dire* as a whole, but only argued ineffective assistance as to one prospective juror. The court addressed the argument under *Strickland*, noting that defense counsel's strategic choices are " 'virtually unchallengeable.' " *Id.* at 562 (quoting *People v. Palmer*, 162 Ill. 2d 465, 476 (1994)). Ultimately, the court rejected the defendant's claim that his counsel's actions were deficient and further found that, assuming there was deficient performance, the defendant suffered no prejudice because the evidence at trial was overwhelming. *Id.* at 562-563.

¶ 67     In *Manning*, the defendant once again argued that counsel rendered deficient performance in failing exercise a peremptory challenge. *Manning*, 241 Ill. 2d at 326. On appeal, the defendant sought reconsideration of *Metcalfe* and urged the court to find that failure to remove a biased juror automatically deprived defendant of a fair and impartial jury, resulting in a structural error that is presumptively prejudicial under *Strickland*. *Id.* at 329-30. The court refused the invitation and found the defendant's argument circular:

          "Once it is determined that counsel was deficient for not striking a biased juror, prejudice is presumed because the defendant was deprived of an impartial jury and that makes the trial fundamentally unfair. Thus, only the deficient performance prong of the *Strickland* test is considered, the defendant does not have to actually demonstrate prejudice, and a new

21

trial is required. This court rejected the defendant's [ ] argument in *Metcalfe* [citation], and we similarly reject defendant's indirect attempt to revisit that argument here." *Id.* at 333.

¶ 68 Defendant's reliance on *Moon* and *People v. Little*, 2021 IL App (1st) 191108, is unpersuasive. In *Moon*, the Illinois Supreme Court presumed prejudice and concluded that the trial court's failure to administer the oath to the jury was structural error requiring automatic reversal, but it did so under the appropriate plain error rule. *Moon*, 2022 IL 125959, ¶ 64. In *Little*, the appellate court found structural error under *Strickland* due to counsel's ineffectiveness and concluded that prejudice should be presumed based on jury discrimination. *Little*, 2021 IL App (1st) 191108, ¶ 39. There, counsel's deficient performance resulted from his failure to raise a challenge under *Batson* when the State used a peremptory challenge to excuse an African American juror—a claim that disqualifies the entire jury and which courts have determined to be reversible "structural error." *Id*. (citing *Winston v. Boatwright*, 649 F.3d 618, 633 (7th Cir. 2011) (a direct *Batson* claim is "so intrinsically harmful as to require automatic reversal" and prejudice should be presumed under *Strickland*)).

¶ 69 In sum, under *Manning* and *Metcalfe*, our supreme court has made clear that prejudice under *Strickland* will not be presumed where it is determined that counsel was deficient for not striking a biased juror. *Manning*, 241 Ill. 2d at 333; *Metcalfe*, 202 Ill. 2d at 560-61. Defendant still must show "a reasonable probability that the result of the proceeding would have been different." *Manning*, 241 Ill. 2d at 327. Applying that threshold, defendant cannot meet the burden on review. We therefore conclude that counsel was not ineffective for failing to remove juror McGrath from the jury pool. In so doing, we recognize that the better course of action in this case would have been the removal of the correctional officer from the jury pool or, in the least, a line of questions regarding his position at the jail. However, based on this record, we cannot say that McGrath's

22

relationship to defendant was so egregious that it rises to the level of an implied bias that should be presumed as a matter of law under *Strickland*.

¶ 70                              III. CONCLUSION

¶ 71          The judgment of the circuit court of Will County is affirmed.

¶ 72          Affirmed.